UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| G.D.S. Express, Inc, *et al.*[1] | ) | Case No. 19-53034 |
| | ) | *(Request for Joint Administration* |
| Debtors. | ) | *Pending)* |
| | ) | |
| | ) | Judge Alan M. Koschik |

# DECLARATION OF CRAIG STACY IN SUPPORT OF
# CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

| | | |
|---|---|---|
| STATE OF OHIO | ) | |
| | ) | SS: |
| COUNTY OF SUMMIT | ) | |

I, Craig Stacy, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct:

1. I am the President or Manager, as applicable of each of the above-captioned debtors and debtors-in-possession (each a "Debtor" and collectively the "Debtors") as well as certain non-Debtor affiliate entities. I am familiar with the operations, business affairs, and books and records of the Debtors.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GDS Express, Inc. (0644), case no. 19-53034; GDS Express Group, Inc. (5619), case no. 19-53035; Business Transportation Services, Inc. (0972), case no. 19-53036; G&M Towing & Recovery, LLC (8021), case no. 19-17803 (Pending before Judge Jessica E. Price Smith); Noble's, Inc. (7367), case no. 19-53037; Nuway Logistics Group, LLC (5286), case no. 19-53038; Wills Trucking Co. (3631), case no. 19-53040; Better Management Corporation of Ohio, Inc. (3107), case no. 19-53041; and Container Management Services, LLC (5436), case no. 19-53042.

1

2. I submit this declaration (the "Declaration") in support of the Debtors' petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), filed concurrently herewith, and other relief, in the form of motions that the Debtors have requested of this Court (the "First Day Motions").[2] I believe that the relief sought in each of the First Day Motions (i) is necessary to enable the Debtors to operate towards the goal of orderly liquidating in Chapter 11 with minimum disruption to its operations or loss of value, and (ii) constitutes a critical element in achieving an orderly liquidation of the Debtors.

3. All of the facts set forth in this Declaration are based on my personal knowledge and upon information supplied to me by others at the Debtors' businesses, upon my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

## PART I

## BACKGROUND

**A.** **The Chapter 11 Filing**

4. On December 27, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Each of the Debtors is operating its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

---

[2] Capitalized terms not otherwise defined herein shall have the meanings given to them in the relevant First Day Motions.

B.   **Summary of Capital Structure and Current Business Operations**

5. Prior to the Petition Date, the Debtors operated a diversified trucking business providing dedicated dry van, pneumatic bulk tanker/roll-off, waste material, and salvage and towing services to a variety of customers across the United States.

6. Attached hereto as Schedule A is a corporate chart showing the corporate and ownership structure of the Debtors.

7. I am the direct sole-shareholder of Debtor GDS Express Group, Inc. ("GDS Express Group"), which is a holding company organized under Ohio law and headquartered in Akron, Ohio. GDS Express Group has five subsidiaries.

8. Debtor GDS Express, Inc. ("GDS Express") is a corporation organized under Illinois law and headquartered in Akron, Ohio. GDS Express is a subsidiary of GDS Express Group and is a trucking company that operated across the 48 contiguous United States and Mexico with a primary focus on the retail industry.

9. Business Transportation Services, Inc. ("BTS") is an asset holding company organized under Indiana law and headquartered in Akron, Ohio. BTS is a subsidiary of GDS Express Group and holds title to 32 tractors and 240 trailers used by GDS Express.

10. Debtor Container Management Services, LLC ("CMS") is a holding limited liability company organized under Ohio law and headquartered in Akron, Ohio. CMS is a subsidiary of GDS Express Group and holds title to 4 trailers.

11. Non-Debtor Towtran, LLC ("Towtran") is a limited liability company organized under Ohio law and headquartered in Akron, Ohio and is a holding company of the equity

interests of certain of the Debtor entities, which make up GDS Express Group's salvage and towing business.

12. Debtor G&M Towing & Recovery, LLC ("G&M Towing") is a limited liability company organized under Ohio law and headquartered in Cleveland, Ohio. G&M Towing is a subsidiary of Towtran and provides towing, repossession and storage services for motor vehicles.

13. Debtor Noble's Inc. d/b/a Nobles Towing ("Nobles") is a corporation organized under Ohio law and headquartered in Columbus, Ohio. Nobles is a subsidiary of Towtran and operated a damage-free towing business.

14. I am the sole-member of Debtor NuWay Logistics Group, LLC ("Nuway"), which is a limited liability company organized under Ohio law and headquartered in New Waterford, Ohio and is a holding company of certain of the Debtor and non-Debtor affiliates.

15. Debtor Better Management Corp of Ohio, Inc. ("BMC") is a corporation organized under Ohio law and headquartered in New Waterford, Ohio. BMC is a subsidiary of Nuway and is a trucking company that provided services to the oil & gas, steel, and chemical industries. BMC owns 10 tractors, 54 trailers, 150 containers, and 7 service units and leases an additional 50 tractors and 18 trailers.

16. Debtor Wills Trucking Co. ("Wills Trucking") is a corporation organized under Ohio law and headquartered in Richfield, Ohio. Wills Trucking is a subsidiary of non-Debtor Totally Recovery Group, LLC and provided trucking services for the waste industry.

17. Prior to the Petition Date and liquidation of the Debtors, the Debtors collectively employed approximately 100 employees, many of whom were drivers and operators of long-haul trucks. The Debtors also hired certain independent contractors who owned and operated their

own units in the long-haul trucking business. As of the Petition Date, the Debtors collectively employ approximately 15 key employees to help with the orderly liquidation of the businesses.

18. Collectively, the Debtors' annual net revenue for the last fiscal year was approximately $44,870,000.

C. **Summary of Pre-Petition Obligations to Northwest Bank**

19. Obligations under the DIP Credit Agreement. As of the Petition Date, the Debtors were party to a certain Credit and Security Agreement, dated as of April 24, 2018, as the same may have been amended, amended and restated or modified from time to time among the Debtors, as borrowers (the "Borrowers"), and Northwest Bank, as the DIP Lender. Pursuant to the DIP Credit Agreement, the DIP Lender provided Debtors on a pre-petition basis with two revolving credit facilities in the aggregate principal amounts of $2,500,000 and $3,500,000, respectively (together, the "Revolving Facilities"). As of the Petition Date, the outstanding unpaid principal balances under the Revolving Facilities were at least $2,500,000.00 and $3,467,637.40, respectively, which includes a Revolving Exposure B that exceeds Borrowing Base B (as those terms are defined in the DIP Credit Agreement) by an amount not less than $2,179,835 (the "Over-advance"). Also pursuant to the DIP Credit Agreement, the DIP Lender provided Debtors on a pre-petition basis four term facilities in the aggregate principal amounts of $3,400,000, $2,500,000, $1,300,000 and $1,000,000, respectively (the "Term Facilities," and collectively with the Revolving Facilities, the "Loan Facilities"). As of the Petition Date, the outstanding principal unpaid balances under the Term Facilities were $2,185,013.39, $1,626,145.89, $840,584.08 and $$875,624.76, respectively.

*Security*

20. Pursuant to the DIP Credit Agreement, the Debtors granted to the DIP Lender to secure the prompt payment and performance of the Obligations (as defined in the DIP Credit Agreement), a lien on and continuing security interest in the Collateral. The Collateral consists of all personal property of the Debtors. The DIP Credit Agreement secures the performance of the covenants and agreements contained in the DIP Credit Agreement and the other Loan Documents (as defined in the DIP Credit Agreement) and secures the payment when due of (i) the obligations of the Borrowers under the DIP Credit Agreement and the Notes (as defined in the DIP Credit Agreement), together with applicable interest, (ii) all amounts expended or advanced by the DIP Lender on a pre-petition basis pursuant to any Loan Document and (iii) all unpaid advances made by the DIP Lender, with respect to the Collateral, for the payment of taxes, assessments, insurance premiums and all other liabilities and indebtedness owing by Borrowers to the DIP Lender on a pre-petition basis. The liens and security interests granted by the Borrowers to the DIP Lender prior to Petition Date, including, without limitation the liens and security interests granted in the DIP Credit Agreement, are referred to herein as the "Pre-Petition Liens."

*Non-Debtor Guaranties*

21. To further secure the obligations owed under the Loan Facilities, I executed and delivered that certain Unconditional and Continuing Guaranty dated as of April 24, 2018.

**D.  Events Leading to the Filing of These Chapter 11 Cases**

22. The trucking industry is facing significant distress across the nation and North America, generally. The Debtors have not been immune to this downturn, especially in 2019. To

6

add to the Debtors' distress, Nuway and its subsidiaries provided services primarily to the oil and gas industry, which is also an industry suffering from a significant downturn. In particular, the demand of the Debtors' services in the oil and gas industry dissipated in July. The Debtors, starting with Nuway and its subsidiaries, have been unable to recover from this downturn.

23. Because the debt obligations are generally cross collateralized, the loss of revenue for Nuway caused GDS Express Group and its subsidiaries to become overextended on the Loan Facilities. On or about December 9, 2019, Northwest Bank froze the Debtors' accounts. On December 13, 2019, Northwest Bank sent a default notice under the Loan Documents.

24. Since that time until the Petition Date, Northwest Bank, at the Debtors' request, has authorized and agreed to authorize the disbursement of certain key payments, specifically including payroll for the employee drivers as they completed deliveries within the week leading up to the holidays.

25. Although the Debtors have explored other investment and refinancing opportunities, they are unable to continue operations without access to cash. The Debtors have accordingly agreed to an orderly liquidation process. The Debtors, in consultation with Northwest Bank, believe that a Chapter 11 process is the most efficient and effective way to provide the Debtors the breathing room necessary to liquidate its assets. The Debtors have assets all over the country, are at risk of being locked out of its leased facilities, and have no other access to financing, except through the Chapter 11 DIP loan from Northwest Bank. Because the Debtors are filing this case on an emergency basis, the Debtors, in consultation with Northwest Bank, will seek to have a better understanding of the universe of assets and liabilities and

7

19-53034-amk    Doc 8    FILED 12/27/19    ENTERED 12/27/19 14:25:54    Page 7 of 14

potential path forward, including a potential 363 sale process, within the beginning weeks of the bankruptcy case.

# PART II

# FIRST DAY PLEADINGS

A.    The Case Administration Motions

    1.    Joint Administration Motion

26.     The Debtors seek entry of an order directing joint administration of their related chapter 11 cases. The Debtors also request that a docket entry be entered on the docket of each of the Debtors' cases other than the case of GDS Express.

27.     The eight Debtors in these chapter 11 cases are "affiliates" as that term is defined in section 101(2) of the Bankruptcy Code. As discussed above, the Debtors have integrated operations. As such, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders that will arise in these chapter 11 cases will affect each and every Debtor. In addition, joint administration will reduce fees and costs by avoiding duplicative filings and objections. Joint administration will also allow the Office of the United States Trustee for the Northern District of Ohio and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency. Based on the foregoing, I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

### 2. Motion to Extend Time to File Schedules

28. The Debtors seek an order authorizing an extension of time within which the Debtors must file their schedule of assets and liabilities and statements of financial affairs (collectively, the "Schedules and Statements") to 28 days following the Petition Date, or January 24, 2020, subject to the Debtors' right to request further extension(s) of time, if necessary. Pursuant to Bankruptcy Code sections 105(a) and 521 and Bankruptcy Rule 1007(c), the bankruptcy court has discretion to grant an extension in connection with the filing of the Debtors' Schedules and Statements "for cause shown." Fed. R. Bankr. P. 1007(c).

29. Given the emergency bases in which this case was filed, and the size and complexity of the Debtors' businesses, a significant amount of time and effort on the part of the Debtors and their advisors is required to collect, review and assemble voluminous amounts of data. The Debtors recognize the importance of the Schedules and Statements in these chapter 11 cases and intend to complete the Schedules and Statements as quickly and as accurately as possible. Based on the foregoing, I believe that the relief requested in the Schedules Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

### 3. Cash Management Systems

30. The Debtors have filed a motion requesting the authority to maintain its cash management system for the interim period. Prior to the commencement of the cases, in the ordinary course of business, the Debtors maintained an integrated and complicated centralized cash management system (the "Cash Management System") consisting of various accounts (collectively, the "Accounts"), including a multiple accounts for the debtors, a line of credit, and zero balance and sweep accounts.

31. The Debtors are seeking to maintain their cash management system in the interim period, for approximately 30 days, until the Debtors are able to determine which accounts are necessary and the most efficient way to set up debtor in possession accounts. The Debtors intend to cooperate with the United States Trustee through this process.

### 4. Expedited Hearing on the First Day Motions

32. Given the importance of the relief sought in the First Day Motions to the Debtors' ability to continue its business operations, the Debtors requested an entry of an order scheduling an expedited hearing on the First Day Pleadings.

33. The Case Administration Motions have been filed in order to allow the Debtors to transition into its role as debtor in possession in the least disruptive manner and to administer the estates in a streamlined and efficient manner. These processes will conserve the resources of the estates and allow the Debtors to concentrate on its reorganization efforts.

## B. Prepetition Claims Motions

### 1. Employee Wages and Benefits

34. The Debtors have filed a motion seeking to pay certain prepetition employee claims. Prior to the Petition Date, the Debtors employed approximately 100 full and part time employees. As of the Petition Date, or shortly thereafter, many of these employees will be laid off, except for approximately 15 as necessary to help with the orderly wind down of the companies.

35. Certain of the Debtors' employees will be necessary to continue the orderly liquidation of the companies, including recovering trucks and collecting accounts receivable. Any delay or disruption in the provision of employee benefits or the payment of compensation

19-53034-amk    Doc 8    FILED 12/27/19    ENTERED 12/27/19 14:25:54    Page 10 of 14

will imperil the Debtors' relationship with the necessary and critical employees. Notwithstanding the layoffs, the Debtors are doing their best to identify critical employees and to retain them during the liquidation.

36. Accordingly, the Debtors request the entry of an order authorizing in accordance with its stated policies (as such polices may be modified from time to time) and in the Debtors' sole discretion, to pay: (a) certain prepetition wages, salaries, overtime pay, incentive pay, contractual compensation, sick pay, vacation pay, holiday pay and other accrued compensation to employees; (b) prepetition business expenses, including travel, lodging, and other reimbursable business expenses to employees (c) prepetition contributions to, and benefits under, the employees' benefit plans; (d) prepetition payroll deductions and withholdings with respect to employees; and (e) all costs and expenses incident to the foregoing payments and contributions (including payroll-related taxes and processing costs).

37. In the instant case, and because the payroll is weekly, the Debtors believe that the amount of prepetition wages, salaries and contractual compensation owing to or on account of any particular employee will not exceed the sum of allowable as a priority claim under section 507(a)(4) or section 507(a)(5) of the Bankruptcy Code.

C. **Postpetition Debtor in Possession Financing**

38. The Debtors further request the entry of an interim order (A) granting (i) authorization to obtain postpetition financing pursuant to sections 105(a), 361, 362, 364(c), and 364(d) of the Bankruptcy Code, (ii) approval to use cash collateral pursuant to section 363 of the Bankruptcy Code, (iii) security interests and priority liens to the Debtor's postpetition lender (the "DIP Lender") pursuant to sections 364(c) and (d) of the Bankruptcy Code, and

(iv) authorization to grant adequate protection pursuant to section 361, 363(e), 364(d)(1), 503(b) and 507 of the Bankruptcy Code to the Debtor's prepetition secured lender, and (B) scheduling a final hearing (the "<u>Final Hearing</u>") pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

39. The Debtors have attempted to obtain and presently are unable to borrow additional funds on an unsecured basis under any conditions set forth in section 364(a) or (b) of the Bankruptcy Code. However, as set forth in the financing motion, the DIP Lender has indicated a willingness to lend money to the Debtors upon the terms and conditions set forth in the DIP Credit Facility, subject to the limitations imposed by the Budget.

40. I submit that the terms and conditions contained in the proposed Interim Order governing the use of Cash Collateral and the DIP Credit Facility, pursuant to which the post-petition loans, advances, and other credit and financial accommodations will be made or provided to the Debtors, have been negotiated in good faith and in an arms' length, open and honest fashion. I represent that the DIP Lender is extending financing to the Debtors in good faith and that the DIP Lender is entitled to the benefits of the provisions of section 364(e) of the Bankruptcy Code.

41. Further, the relief requested by the motion is necessary to avoid additional irreparable harm to the Debtors' estate. The Debtors require money for the orderly liquidation of its business, including the payment of critical prepetition and post-petition wages and salaries, the payment necessary to recover trucks and for the collection accounts receivable.

## CONCLUSION

42. In furtherance of its chapter 11 efforts, for the reasons stated herein and in each of the First Day Motions, I respectfully request that the relief sought in the First Day Motions be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

December 27, 2019

_____
Craig Stacy